Good morning. Beautiful day out there finally. It's not snowing. This morning we have three cases to be heard and argued and one case which is being submitted on the record. For the purposes of our recording, the submitted case is 2010-3008 Dolinsky v. DHS. And the first case is 2009-1382 Simmons v. Seagate. Is it Chiavello? Thank you. I believe the court people would pronounce it Chiavello. We'll do it the right way. Thank you. Your Honor, my name is Bob Chiavello with the firm of Fulbright and Jaworski representing Siemens today assisting me is Ms. Miriam Quinn of Fulbright and Jaworski and representing Siemens is Mr. Frank Nuzzi. Your Honors, there are two issues that are front and center on this appeal and that's the determinations of obviousness and section 102 G anticipation. Neither determination is supported by substantial evidence in this record. I want to focus on obviousness first. The weakness of Seagate's expert testimony, Dr. Wang. And by weakness you mean as you say in the briefs that it was too conclusory? Yes, Your Honor. Too conclusory and too general. Well, isn't a general verdict sufficient? Do we go behind the determination of a general verdict to figure out what the jury did and how it did it? Yes, Your Honor. When the party attacking the patent is testimony, the Supreme Court and this court in the antigenetics case have set out that there are certain standards that need to be met by the expert's testimony. When the expert is using a motivation to combine argument with the prior art, there needs to be particularized testimony explaining why a person of ordinary skill in the art at the time would know to use the to make to make the combination in question. But in the context of a jury verdict in this jury, this trial lasted for weeks, right? That's correct, Your Honors. I presume that on cross-examination, competent counsel had the opportunity to cross-examine Dr. Wang. So to the extent that you come up here now on appeal and we've got a cold record and you say it was conclusory, I mean, isn't that what trials are made of? You could have cross-examined him. You had a shot at proving to the jury that his testimony did not have sufficient foundation and presumably the jury, as we all agree, rejected that. Well, Your Honor, I would submit in the antigenetics and must require that there be some connection between the art and the motivation to combine the art. Otherwise, an expert, as in this case, can simply say here's the art. In my opinion, there were reasons to make the combination and that would sustain a jury. I would submit to Your Honor that that testimony standing alone, and that's what we have here, it does not meet the clear and reasonable evidence to meet that standard. Picking up on the on the KSR case, the Supreme Court noted that the testimony has to be particularized and has to be factually supported, showing some rational motivation to make the combination, and that other parts of KSR continuously lead us to a non-rigid test that we apply, and also to something called common sense, which would allow, I think, something beyond the particularized testimony of an expert to reach a conclusion of motivation, right? Well, common sense in this art, obviously, a highly complicated and highly technically sophisticated art, I'm not sure where how one would would address the common sense. But isn't common sense in KSR really against the backdrop of someone of ordinary skill in the art? What would be common sense to someone of ordinary skill in the art, not just the average individual walking off the street? That's exactly right, Your Honor. It would have to be a person of ordinary skill in the art, and here there was no testimony as to what a person of ordinary skill in the art would know with respect to the problems that the expert identified. He identified corrosion, which, by the way, had nothing to do with the claims in this case, stray fields, and then he said a person reading one of the articles, the Parkin One article, would somehow know to employ the structure of that, part of the structure disclosed in the article, to modify the existing sensors to come up with the invention. There was no testimony by the expert to suggest that the structures described in Parkin, or what we refer to as the artificial antiferromagnet, the AAF, was known to address corrosion problems. He provided no testimony that a person of ordinary skill would know to use an AAF to address the stray fields problems, and so it lacks the person of skill in this art would have tools in his toolkit on which to use to solve the problem. Are you really asking us to form a jury pool, which would be people of ordinary skill in the art, in order to come up with an obviousness finding? Or can just a general pool of jury members come up with an obviousness finding properly instructed by the judge on the law and with proper evidence submitted by the parties? I mean, if there is evidence to show A plus B equals C, even though it might end up being C1 rather than C all by itself, is that sufficient for the jury's findings and have substantial evidence to support their verdict? I would suggest not in this case, Your being relied on, and particularly the Parkin 1 reference, taught away from the invention. The invention, it was for a sensor. Sensors are to be stable structures, and Dr. Wang admitted that the structure described in the Parkin articles rotated in the presence of magnetic fields, which was contrary to what was sought in a sensor. And so, if the expert wants to use that reference, say A plus B, where B teaches away from the combination, then there needs to be some explanation of how a person of ordinary skill in the art would overcome that teaching away. And there was no testimony in this case by Dr. Wang on that issue. And the court, in its opinions, has said it needs to guard against hindsight reconstruction using the claims as a guideline or a roadmap, which is exactly what happened in this case. Dr. Wang said, well, I can combine, you know, the claims call for these elements, and I can combine, I can pick and choose pieces of the prior art and assemble them in the form of those elements, and lo and behold, they solve the problem. Well, that's what the patented invention, that was the objective of the patented invention, and that's what the patented invention did. And again, using hindsight, it's straightforward to go and pick and choose items from the art. And so, your principal argument is whether or not they would have been motivated to pick those two combinations because they were otherwise incompatible. That's exactly right, Your Honor. That's exactly right. Just quickly, Seagate emphasizes in his briefs the problem of corrosion having to do with what was referred to as the natural anti-ferromagnet. That had no play, that was a structure that was not part of the claimed invention, and so the fact that a component that is not part of the claims may have had a corrosion issue should play no role in motivating a person of ordinary skill to make the combination that Seagate suggests. Before your time runs out, can I just turn you briefly to anticipation? Yes, Your Honor. And that is, what's your main argument? I mean, is it on a standard that was used? Was it that the jury instructions used no unreasonable delay as opposed to reasonable diligence? That's correct, Your Honor. The jury instruction was improper. In other words, the jury instruction number 25 focused on unreasonable delay. It did not articulate a diligence standard, and the jury was therefore not instructed on the proper standard to employ. And your best case on whether or not a 102G abandonment concealment case requires a reasonable diligence standard? I would suggest, Your Honor, Apotex, Fujikawa, Pollock, all talk in terms of a 102G analysis in the situation where the first inventor is relying on renewed activity and the filing of a patent application. In all those cases, the court said diligence was required. Seagate's case, that it relies on the FlexRest case, had to do with commercialization. In other words, commercialization after a reduction to practice. And your view is that you agree, right, that even if you were to prevail on the anticipation issue and that reference goes out, that doesn't affect the obviousness? The obviousness of, that's correct, Your Honor, the combination that... Parkin 1 and 2, right? That's correct. They're not part of the patent. That's correct, Your Honor. Could you cover the issue of the inequitable conduct where the judge filed an inequitable conduct and you're saying it conflicts with the jury finding? Yes, the judge said that it was not necessary for the inventor who knew about the Parkin 1 and Parkin 2 references to cite them to the patent office because they taught away from the invention and would not, a person of ordinary skill would not look to them to make the combination and so it was not improper for him to not disclose them to the examiner. It was consistent with his testimony. Why do we care? I mean, why do we... It may be an inconsistency, but is it an inconsistency that matters given the jury verdict? Well, I think it does matter in the sense that it and therefore if Dr. Wang wants to use them in making his combination, he was required to go on, go additionally and explain, well, how and why would a person use them and know to overcome the instability issues that they described, which he did not do. It bolsters the burden that's on Dr. Wang. Yes, Your Honor, exactly. But wouldn't the jury verdict really trump that determination? Not necessarily, Your Honor. I mean, the fact that the Parkin articles teach away is not really contradicted by Dr. Wang. I mean, he agrees that the structures rotate, but his testimony was, well, simply a person of skill could combine them, but never explaining how or why a person would combine them, essentially the how, as to how a person would overlook or overcome the rotation problem and make the combination. What if the jury disagreed with the judge and it found as a factual matter that they were very material? I mean, why would we read necessarily the judge's conclusion with respect to materiality onto the jury? Well, the jury wasn't asked about materiality in that sense. They were, there was no, so I think it's a general verdict. Right, it would invite speculation as to what they what they found. I mean, the testimony that we call it a black box. Well, the testimony that Seagate relies on is that this testimony of Dr. Wang to support the verdict, a handful of pages, eight to nine pages in this 20-day record where he talks about making the combination. Thank you. We'll restore two minutes to you, if I don't time. Thank you. May it please the court. David Gross from Fagry and Benson. On behalf of the Appellee Seagate with me at table is Cal Etzi. The court understands there are two independent bases for affirming the jury verdict. We don't need to get to the prior invention defense if the court affirms on obviousness. I want to make a point about the general verdict decision. At the district court below, Judge Selna said to counsel, how do you want to do this? Do you want specific findings on obviousness that the jury makes or do you want to do a general verdict? And we all understood what that meant if you do with a general verdict. The standard of change, it means it is a type of black box and you have a substantial evidence standard of review, which is a real standard of review. It has teeth, it's real, but it's a very different situation than if you do a special verdict that has very special findings on obviousness. Counsel conferred and we said unanimously, let's go with a general verdict. We then tried our case, we had the general verdict and the jury found that it was obvious. It was necessary for the jury, notwithstanding the difference between a special and a general verdict, it was some evidence upon which to base a conclusion that there was a motivation to combine. Absolutely. You still have a substantial evidence standard review, which, Your Honor, we easily meet. The only issue on appeal now, if you read their brief, is whether there was a motivation to combine and whether there's substantial evidence in the record to show a motivation to combine. Why don't you show us that evidence? Yes, Your Honor. Well, first of all, what we did is we presented three reasons for the person of ordinary skill in the art to combine an existing GMR sensor with a known AAF, or artificial antiferromagnet, and this was known prior art. This wasn't a situation where we didn't know what we were talking about. A person of ordinary skill in the art who was highly creative and highly educated, PhD with substantial experience, would have started with something called the Grunberg reference. That reference was a functioning GMR sensor, which measured resistance that everything a sensor did, and it had the first layer, the second layer, and the third layer, which is a bias layer in which the magnetization is approximately constant. It had everything you needed. The only thing the prior art was missing was an AAF, and this was undisputed from their expert, undisputed from our expert. So in that sense, the trial became very narrow. As Siemens kept admitting things, as the cross-examination of Siemens expert kept admitting things, the case got narrower and narrower to the point where we were simply showing the jury that a person of ordinary skill in the art would have seen this reference that was lacking a well-known AAF, which was all over the literature, common knowledge, and then would have said, all right, I can solve this problem by adding the AAF, and our expert explained, and I want to give a record cite to page 30230, and we also cite it in our brief at page 22, but our expert explained what you do. Our expert said basically what he is saying, and this is going to the Parkin 1 reference, which is the explicit teaching, we can remove the purple layer, which is an anti-ferromagnet, that's the fourth layer. I'm sorry, Judge Brooks, there are too many volumes of this appendix. I apologize. I think we're going to ask what volume you're in. Your Honor, I'll have that answer in just a second. 20, I'm sorry, 30230. Okay. Your Honor, we believe it's volume 2. I actually think it's volume 3. Sorry, Your Honor. 30230, and this is simply Dr. Wong saying about Parkin 1. This is the explicit teaching in Parkin 1, and I want to be clear, by the way, that what Siemens is doing is misstating Dr. Wong's testimony. He did not say there's any teaching away, nor did he imply there's teaching away, and he said to the jury, here's the prior art. He explained the problem. He went over the key reference. He then went over the problems, said they'd be combined, but in one of the aspects of his testimony, he said the following. Did he say, well, what about Parkin 2? Which is the one that was teaching? Parkin 1 has the explicit teaching. Parkin 2 is merely an example of how you could apply that teaching. It in no way compels how you are going to use an artificial antiferromagnet. It's one example. What Siemens is trying to do is say that our theory was you take the example and somehow force it into a GMR sensor, and we never suggested that, and on cross-examination, we never agreed with that either. But what Dr. Wong says here is basically what he is saying, he's referring to Dr. Parkin, we can remove the purple layer and replace that with two additional layers. One is non-magnetic and one magnetic. And that additional magnetic layer is antiferromagnetically coupled to the bias layer in the sandwich structure. Now, your honor, why am I raising that point? Why am I making that point? Because you notice what Dr. Wong is saying. He's saying there's an idea in this explicit teaching which is an AAF. An AAF is merely one layer pointing in one direction, then you have a non-magnetic layer, and then you have another layer pointing in another direction. That's an AAF. And in this Parkin 1 reference, Dr. Stuart Parkin said if you want to pin the magnetization of a layer, and in this other reference, the Grunberg reference, you're looking for ways to pin that bias layer, you could do it either with an antiferromagnet, and that's what this other reference uses, or you can use an AAF. And what Dr. Wong said was you'd look at that explicit teaching, you'd say, well I know I can pin it with an antiferromagnet because that's what I've been using. Dr. Parkin is suggesting I try this other way, and I would try this other way. In other words, it's an teaching that says you should try this. It wasn't in any way a teaching away article, nor do we ever agree with it. In fact, our experts said there's no ambiguity. Now why did I talk about the fact that Dr. Wong mentions that you'd put two layers on the existing sensor? Because what Dr. Wong didn't say was you would go to Parkin 2, and you'd grab whatever was going on in Parkin 2, and you'd force that onto a GMR sensor, and then the sensor wouldn't work. And that's what Siemens keeps trying to say we said. They say that we were trying to literally take a structure from the example, from the teaching, and force it. And we've made it clear that's not what his testimony says. His testimony says you'd apply an AAF, and when you went to apply it, it already had a bias layer. So you just add those two layers. Now why is that important, Your Honor? Because their inventor basically testified that's what he did. In other words, he took an AAF. So it's not that our combination would be inoperable. It's not that Parkin 1 taught away. Our expert gave a very common-sense explanation for what a person of ordinary skill in the art would do based on an explicit teaching, based on Dr. Parkin telling persons of ordinary skill in the art you should try this. It's a little odd though, is it not, that the judge here in the context of inequitable conduct found that Parkin was not even material. Your Honor, it's odd when you think about it, but what's interesting is this one time where you can actually ask that decision-maker, what do you make of this? What do you make of it? You said this was not material. Can you talk about that? It's not often you get to talk to the decision-maker. And in this case, the decision-maker said, yeah, I said that, but in no way was that inconsistent with the jury verdict. What the jury did had substantial evidence. I sat through this trial. I looked at the PowerPoint presentations. I watched the jury pay the evidence. No, we're okay. There's no problem with what I did. And it's rare that you have that situation where someone says something inconsistent and then you go to that very person and they agree with us, which is what happened here. So there's no legal inconsistency and we have a situation here where a very qualified expert from Stanford University with 20 years of experience in GMR technology, who had more experience than their expert, their expert conceded that, walked the jury through the three reasons. The first reason was Parkin 1, explicit teaching, took the jury through the article, explained the combination, did not say what Siemens was saying, did not say that, did not force anything from Parkin 2 into it. And so we really have an issue where they disagree with what the jury did. They don't like it. But what they could have done is cross-examined the expert and raised all the various points they raised on appeal. And they didn't do that. When they did cross-examine the expert, they made no headway. And in many instances, they didn't cross-examine the expert on the particular points they're trying to make in their briefs. And so we're in a situation where our expert gave either unrebutted or or uncontradicted or unchallenged testimony. And when they did try to challenge him, he flatly disagreed with them. Before you run out of time, why do you, is there no conflict in your judgment between the jury verdict and the finding of the judge of the issue regarding the determination of inequitable conduct? Well, your honor, here the judge found that there was no materiality and no intent to deceive. The jury found that there was obviousness. The judge then said it is reasonable for the jury to disagree with me. The reasonable people could disagree. And the jury's findings trump the judge's findings on the jury verdict. In other words, a judge can't say I'm going to reverse the jury verdict because I disagree. The judge has to say there's a lack of substantial evidence. And here, the judge said explicitly there is substantial evidence. So we were in a situation where the judge may have disagreed with what the jury did, but the judge himself said there was substantial evidence. And that can occur. You can have reasonable people disagree. What is the standard that we apply? Is it our procedural law of the Federal Circuit, or is it the Ninth Circuit? We believe it's the Ninth Circuit law, and the Ninth Circuit law is pretty clear that when you have a judge finding such as this and a jury verdict that you defer to the jury verdict. And Judge Selna agreed. There was no issue here. We really think that's... And the jury verdict trumps the judge's determination? Yes, your honor. And because, that's because the jury verdict only needs to have substantial evidence. And this judge said there can be substantial evidence. Essentially what he was saying is reasonable people could have sat through this trial and either agreed with what our expert was saying or disagreed. That's why you have a trial. He said essentially if I was on the jury, I would have disagreed. But I understand why the jury agreed with it, and I'm gonna uphold that. That's perfectly reasonable and perfectly consistent with the law, whether Ninth Circuit law or any other Circuit law. Now... If we apply our law, is there a difference? No, your honor. Not that I'm aware of. I mean, I think it's clear that this court reviews the jury verdict for substantial evidence. And the fact that a judge saw that there was a reasonable disagreement with the jury is not a basis for overturning a jury verdict. Particularly where the judge said there is substantial evidence. Remember, there's also two independent reasons. Our expert also talked about the straight flux problem. And our expert said there was a problem of straight flux and that a person would have used an AAF in order to solve the straight flux problem. And I do want to say in their reply brief, they suggest that our expert somehow said that the solution to the straight flux problem was not anti-paramagnetic coupling. That it somehow fell outside the claim. It's an argument they make for the first time, and it should be waived. But if you look at it, what's very interesting, and I'm embarrassed to say I don't know the volume, but your honor, on on page 30282, which is Dr. Wong's testimony, he was asked whether this form of coupling that he said solved the problem was anti-paramagnetic. And he said at from lines 19 to 21 on this appendix, page 30282, quote, it is anti-paramagnetic, which is what the claim required. And then on the next page, they challenged him again, and he said it from lines 9 to 12 on page 30283, he said, you are wrong. So they suggest in their reply brief, and we didn't get a that he had conceded that it fell outside the claim. In fact, the pages they didn't cite, and the lines they did not cite, he explicitly disagreed with them, and said this form of coupling was anti-paramagnetic, which would have meant it fell within the claim. So that's a second reason. You can't raise new issues on the reply brief. No, your honor. Yeah, they shouldn't be able to do that. But that's where we are. Even today, they're coming up with ways to cross-examine Dr. Wong, but that is not what you do. You have to do it at trial, and then you have to show some with the record. And he had a third reason as well, which is corrosion. Now turning briefly to the prior invention defense, which is a separate basis on anticipation. Where does the no unreasonable delay standard come from? That was the jury instruction. Yes, yes, and that was a proper instruction and a correct instruction, and the FlexRest decision really controls here. FlexRest was not just a commercial case. FlexRest also had a case where someone was trying to file a patent. They were doing two things, and under the which this court obviously would apply. In FlexRest, the court said a seventh month period is something that is so reasonable as a matter of law that we're not going to send it to a jury. In other words, it was an unreasonable delay standard, but that was found to be reasonable. And in our case, we have a 23-month total period from reduction to practice and from filing. Siemens concedes that that's the correct standard, unreasonable delay for the only disagreement Siemens has is with renewed activity. They want to change the law on renewed activity and apply reasonable diligence. That's where it gets tricky, and so what we have here is an unreasonable delay standard for 23 months, and the Pollock decision is 17 months. You have reduction to practice to filing in 17 months, and so we think if this court found 17 months could be reasonable, that a jury could find the entire period of 23 months to be in that period reasonable. We don't even need to get to whether there should be a special standard for renewed activity. How do we know they specifically found that, though, in the general verdict? Your Honor, we don't, and what we look for is is there substantial evidence for any basis, and we think 23 months is more than reasonable. There was no red flags here. Before Siemens entered the field, IBM had reduced it to practice, had also made a decision to get a patent, had done a prior art search, had done an invention disclosure. All that had occurred before Siemens came in the field, and then they got a patent application within 10 months, and that's where we are. So we don't think the court should throw out the standard on renewed activity or change the standard to say it's reasonable diligence. That would really be changing the law. In Pollock, there was a three-month gap, and had you applied a strict reasonable diligence standard to Pollock, which involved renewed activity, you would have had a different result. In Pollock, at 17 months, you had renewed activity. They explicitly talked about it, and they in no way applied a reasonable diligence standard. Pollock is also an advanced decision. Yes, yes, and so this court would be making new law if it said that someone is a first inventor, they've reduced to practice, and simply because they renewed activity, we're going to change the standard and treat them like a second inventor and force them to meet a reasonable diligence standard. That would be new law, and we urge the court not to adopt that. Thank you. Thank you, Mr. Gross. Mr. Curiello? Yes, thank you, Your Honor. Just a minute. Mr. Gross's argument was simply that, in discussing Dr. Wong's testimony, is that Dr. Wong said, well, a person of ordinary skill would apply the AAF to this known structure. He never said how the person of ordinary skill in the art would know to use the AAF to solve the problems that he addressed. In other words, there was no testimony or suggestion that AAFs were known to address corrosion problems or that AAFs were known to address stray field problems. And then, with regard to Parkin, is the problem of the teaching away, and there was no explanation as why a person of ordinary skill would know to adopt part of Parkin, but not the other part, the part that would be harmful. So, even under this substantial evidence test, which we agree is the appropriate test here, is this testimony doesn't meet that test and does not rise to the level of clear convincing evidence that can sustain an obviousness rejection. With regard to the anticipation argument, FlexRESC was definitely a commercialization case. Yes, there were patenting activity, but the court noted that there was continuous activity from the time of the reduction of practice to the public disclosure and commercialization. And so, that case would have met a diligent standard as well. But that's not the case here, where you have a resumption of activity followed by the filing of a patent application for constructive... Is there any case that really establishes the type of diligence that we need to follow, a test or a standard for diligence? Well, the diligence is, in the cases on interference, say that you must show activity from the time just prior to the priority date of Siemens to the filing of the application and explain the gaps. And what we have here is out of a 10-month period, we have seven months of unexplained inactivity. And that's, as far as I know, has never been found by this court to sustain a... meet the diligence standards. Now, one final point... Does it make any difference whether it was two months, three months, seven months? The length of the time period? I do believe three months has been generally found to be... fall within the standard beyond three months. Explanation needs to take place or needs to be presented, which did not happen in this case. And one quick point is, again, they're relying on the activity of a different inventive... on different inventive entities. For the reduction to practice, they rely on one inventive entity. But with respect to all of the other conduct, including resumption of activity and the filing of the patent application, that was by a different inventive entity. And I'm, again, not aware of any case in this court where one inventive entity has been... has relied on the activity of a different inventive entity to establish a resumption of activity and a constructive reduction to practice by filing of the patent application. Thank you. Thank you, Your Honor. Case is submitted.